UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| JESSE SNIDER, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | CAUSE NO. 4:09-CV-037 JD |
| | ) | |
| TODD PEKNY, et al. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

While on a routine nighttime patrol in Carroll County, Indiana, Conservation Officer Todd Pekny heard small-caliber rifle shots coming from what turned out to be Jesse Snider's property. Pekny suspected deer poaching, but his subsequent investigation uncovered a stockpile of firearms, a stash of bomb-making materials, and a marijuana grow operation. The State dismissed all criminal charges after a circuit court judge in Carroll County suppressed all of the evidence uncovered during the search of Snider and his property, but Snider lost his job with the postal service. Snider filed this lawsuit against everyone involved in the investigation, the prosecution, and termination of his employment under 28 U.S.C. § 1983 and state law. *See* DE 1. Various parties and claims have been dismissed from the case, which is now before the Court on cross motions for summary judgment by Snider and the remaining defendants. *See* DE81, 83, 85, 89.

## BACKGROUND

Officer Pekny was patrolling a county road south of Flora, Indiana, at 10:30 p.m. on October 27, 2007, when he heard small-caliber rifle fire. *See* DE 83-2 at 23. He suspected deer poaching, because it was after sunset and not yet firearm season (the season for hunting deer with firearms), and there had been complaints of deer poaching in the area in the past—Pekny himself had made an arrest for nighttime hunting in the same area during the previous deer

season 11 months before. *See* DE 84 at 3; DE 83-2 at 7. He drove around to pinpoint the location of the shots. When he stopped again, he continued to hear shots to his west,[1] and saw a group of people standing around laughing on Snider's property, and saw two people walk from the residence toward a pole barn behind the residence. *See* DE 83-2 at 6. He drove a short way to the west of Snider's property and heard shots again, this time to his east. *Id.*

Although he had witnessed no crime on Snider's property at that point (no state or local laws prohibited firing a gun), and there had been no complaints that evening of deer poaching, Pekny believed at the time that the shots were related to wild life poaching violations. *See* DE 83-2 at 6. He requested that additional officers be dispatched. *See* DE 82 at 4, ¶ 8; DE 84 at 4, ¶ 6; DE 90 at 2, ¶ 4. Shortly before midnight Sergeant James Bishop from the Flora Police Department and Deputy Jason Dunning from the Carroll County Sheriff's Department arrived to assist, and Pekny explained the situation. DE 83-2 at 6; DE 83-3 at 3. The three officers then drove to Snider's residence and parked their marked vehicles in his driveway. Just before pulling up to the residence, Pekny saw two men walk into the garage. *See* DE 83-2 at 12. He did not see any guns. *Id.*

With guns in the low ready position, the officers approached a garage in which they could see two individuals, Snider and Mark Hokema. *See* DE 90 at 2, ¶ 5. They asked (or ordered, depending on who is telling the story) the men to come out of the garage, and then patted them down to check for concealed weapons. Pekny patted down Snider, and one of the other officers handled Hokema. DE 83-2 at 13. Snider and Hokema provided identification upon request. *Id.* Pekny asked Snider about the gunshots and what they had been doing. DE 82 at 5, ¶

---

[1]Snider claims that Pekny did not hear shots during the time he watched the property, but this is not supported by the record. In the portion of the deposition that Snider cites, Pekny states only that he did not hear gunshots *while on the property*. *See* DE 83-2 at 13. Elsewhere, Pekny stated that he heard gunshots to his west from his surveillance position. *Id.* at 6.

14. Snider denied that any shots were fired and explained that he and some friends had been playing paintball in the pole barn—Snider claims he said there were 10 people, while Pekny recalls that he said 12. *Id.*; DE 90 at 3, ¶ 7.

The details of the next half-hour or so are disputed. Snider claims that he and Hokema were marched at gun point to the pole barn, where he asked the rest of his party to come out. *See* DE 83-1 at 56. The officers lined everyone up sitting down with their hands behind their heads and their ankles crossed, and patted them down for weapons. *Id.* While Officer Bishop watched Snider and his guests, the other officers entered the pole barn and began to search inside. *Id.* at 57. Snider and the others were facing away from the pole barn and could not see what was going on, but Snider could hear the officers going through his things and stood up to protest and told them that they did not have his permission to go through his barn. *Id.* at 58. He saw the officers look underneath his lawn mower and though several moving boxes. *Id.* at 62–63. Bishop then handcuffed Snider and sat him back down. *Id.* at 58. While officers continued to go in and out of the barn searching, they also gave breathalyzer tests to anyone who looked underage. *Id.* at 59. At some point, most of Snider's guests piled in a car and were allowed to leave. *Id.* at 59–60. Hokema called a friend and left a few minutes later. *Id.* at 59. One other guest, Justin Erdie, was detained by police at the residence, but Snider did not know what was taking place there and only found out more details after the fact. *Id.*

The defendants tell a different story. After they had questioned Snider and Hokema, the officers and Snider and Hokema walked over to the pole barn, about 60 yards away from the garage. DE 83-2 at 13. Snider led them to a large (30 by 80 feet) barn, turned on the lights and told them to go ahead and look in the barn for the others. *Id.* at 13. Pekny stepped in and looked around, but did not see anyone and stepped out. *Id.* at 14. He then walked around back of

the barn, while Bishop stayed with Snider. *Id.* At that point, six or seven people walked from behind the barn toward Pekny. *Id.* Pekny told them to put their hands up to make sure they did not have firearms and sent them to stand near Snider. *Id.* They were all frisked. *Id.* Pekny and Deputy Dunning continued to look for other people because they still had not accounted for 12 individuals and were still trying to figure out what was going on. *Id.* While Bishop stayed with Snider and the others, the other officers went back into the pole barn to see if anyone was hiding in there. *Id.* Snider did not specifically consent to the second search of the barn, but neither did he object, so Pekny assumed he had consent. *Id.* at 13. During the course of the second sweep of the barn, Dunning discovered a wooden box in plain view that the officers recognized as a "dug out" that normally contains a pipe and an area that contains marijuana. *Id.* at 15. Pekny believed that the box was drug paraphernalia and that Snider had violated Indiana Code § 35-48-4-8.3(a)(1) by recklessly possessing drug paraphernalia. *Id.* at 18.

Around this time, the officers noticed that there was someone in the residence. *Id.* at 16. Pekny and Sheriff Deputy Jay Schimmel, who had arrived after the officers had lined up the individuals they had found on the property, approached a glass door in the rear of the house and saw a rifle inside the house and spent firearms casings and shells on the back porch. *Id.* They knocked, and an individual later identified as Justin Erdie came out. *Id.* Pekny patted down Erdie and noticed what he believed to be two thick bundles of folded dollar bills; when Pekny asked what it was, Erdie pulled both bundles from his pockets and stated that he had about $1,500. *Id.* at 32 (probable cause affidavit). Erdie said his ID was in his van, so the officers went with him to get it. *Id.* at 16. When they got there, Erdie threw a glass pipe into the back seat, which the officers discovered contained marijuana when they recovered it. *Id.* Erdie was placed in handcuffs.

At this point, Pekny believed that there may have been marijuana or other illegal drugs or substances being stored or used in the residence, outbuildings, or vehicle. *Id.* at 32. He left to obtain a search warrant at about 1:00 a.m. He returned with a warrant authorizing the search of the pole barn and Erdie's vehicle—though notably not the residence or any other outbuildings—for marijuana or other illegal drugs and paraphernalia for using or selling marijuana. *Id.* at 35 (search warrant). Pekny and Dunning searched the pole barn,  and discovered other contraband items, including a "Chinese throwing star" and an owl's foot. *See* DE 82 at 7, ¶ 25. Dunning, who had experience with explosive devices, also recognized materials that could be used to produce explosive materials, arranged in what appeared to be the stations of a bomb making factory. DE 83-4 at 10.

This new development caused Dunning to call for assistance from the Tippecanoe County Bomb Squad. When the bomb squad arrived, Pekny showed them pictures of what had been found. They told Pekny that they needed an ambulance and the fire department on standby, as well as a medical helicopter, that they also needed to do a safety sweep of all the buildings on the property, and that anyone in the house to the west needed to be evacuated. *Id.* Pekny informed the bomb squad that the judge had specifically refused to authorize a search of the residence, but was told that it was part of the bomb squad's procedures to account for anyone who might be in the area, in case something goes wrong. *Id.*

During the safety sweep, the bomb squad discovered an indoor marijuana growing operation, and numerous firearms, unidentified powder, hand flares, and disassembled shotgun shells. DE 83-2 at 37 (second probable cause affidavit). Pekny obtained a second search warrant covering the house, outbuildings, and vehicles on the premises for illegal weapons or explosive materials. *Id.* at 40 (second search warrant). He returned and executed the warrant.

Snider was charged with nine felonies and three misdemeanors. All charges were dismissed after a Carroll County circuit judge found that the officers search had violated the Fourth Amendment by seizing Snider without a warrant or reasonable suspicion of a crime and by searching his property without a warrant, consent, or exigent circumstances. After an independent investigation into his conduct, based in large part on information provided by state law enforcement officials, the United States Postal Service suspended and then terminated Snider.

Snider then brought this suit, which in addition to claims for Fourth Amendment violations against those involved in the investigation on October 27–28, also brought claims against his supervisors at the United States Postal Service related to his termination, against local media for the coverage of the events, and even against one "Jane Doe" for refusing him unemployment insurance. Judge Van Bokklen dismissed the claims against the postal service employees on February 25 and May 12, 2010. *See* DE 45, 50.

On October 31, 2011, Snider filed a motion for summary judgment on his claims against Officer Pekny. *See* DE 81. The same day the Indiana Department of Natural Resources, Officer Todd Pekny, and Daniel Dulin[2] (the "State Defendants") filed a motion for summary judgment on all claims, *see* DE 83, as did Flora police officer James Bishop, *see* DE 85. The following day, Jason Dunning, Jay Shimmel, Dennis Randle, and Kevin Hammond, the Carroll County Sheriff's Department and the Commissioners of Carroll County (the "County Defendants") filed their own motion for summary judgment. *See* DE 89.The motions are all ripe for adjudication.

---

[2]The claims against Dulin were dismissed with prejudice on January 3, 2012, pursuant to a voluntary stipulation under Federal Rule of Civil Procedure 41(a)(1).

**DISCUSSION**

I.      **Standard of Review**

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Kerri v. Bd. Of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. On the other hand, where a factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).  Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor the nonmoving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in her favor. *Anderson*, 477 U.S. at 255; *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). But the non-moving party cannot simply rest on the allegations or denials contained in its pleadings. It must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000).

The fact that the parties have cross-filed for summary judgment does not change the standard of review. *M.O. v. Indiana Dep't of Educ.*, 635 F.Supp.2d 847, 850 (N.D. Ind. 2009). Cross-motions are typically analyzed separately under the standards applicable to each. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008). Here, the Court will consider the defendants' motions first, taking any disputed facts in the light most favorable to Snider. The defendants claim that they are entitled to summary judgment on all of Snider's claims. Because they are correct with respect to all the claims that Snider also seeks summary judgment upon, the Court will not need to consider Snider's motion.

## II. Analysis

After the dismissal of many of the defendants and claims, by either Court order or stipulation, what remains is the core of the dispute. Did Officer Pekny, Deputy Dunning, and Officer Bishop unlawfully invade Snider's property, detain him without probable cause or reasonable suspicion of wrongdoing while they unlawfully searched his property, and then arrest him for something that did not amount to a crime? While some of the conduct of police officers on Snider's residence on October 27 and 28 is questionable—enough that a circuit judge in Carroll County suppressed all the evidence—the Court ultimately concludes that the defendants are entitled to summary judgment on all but one of Snider's claims.

As noted above, the Court will consider the defendants' motions for summary judgment first. Because the defendant's are entitled to summary judgment on each claim on which Snider

also seeks summary judgment,[3] it will be unnecessary to consider Snider's motion separately. Further, because the claims and defenses of the various defendants overlap, the Court will consider the defendants' separate motions together on a claim-by-claim basis, distinguishing between the defendants where appropriate.

## A.      Federal Claims under § 1983

In Count 1 of his complaint Snider claims that the remaining defendants in this case violated his federal constitutional right to be free from unlawful searches and seizure. Within that single count, Snider identifies several discrete actions that allegedly violated his rights. For purposes of analysis, the Court will consider the following claims separately, taking the facts in the light most favorable to Snider: (1)Was the officers initial entry onto Snider's property unlawful? (2) Was the initial investigatory detention of Snider reasonable at its inception and in its scope? (3) Did the officers unlawfully search Snider's pole barn? (4) Did the officers have probable cause to arrest Snider following the search of the pole barn? (5) Were the subsequently obtained search warrants valid? Finally, the Court will address the claim that the officers conspired with each other and others to violate constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments.

Because the federal claims lie under 18 U.S.C. § 1983, the Court's analysis must focus not merely on whether there was a constitutional violation, but also whether the defendants in this case may be held liable in a civil action for any violation. Governmental officials are entitled to immunity from civil liability under § 1983 for their actions, with the important qualifier  that the officials' conduct must not violate any clearly established statutory or constitutional rights of

_____

[3]Snider does not appear to seek summary judgment regarding the search of the pole barn, the lone claim that survives summary judgment, perhaps because there appears to be a material dispute of fact regarding whether Snider consented to the search.

which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"Clearly established" means that the contours of the right are sufficiently clear that a reasonable official would understand that his conduct violates the rights in question, and that in light of pre-existing law, the unlawfulness of the act is apparent. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). That "preexisting law must dictate, that is, truly compel the conclusion for every like-situated, reasonable government agent that what he is doing violates federal law *in the circumstances.*" *Khuans v. School Dist. 110*, 123 F.3d 1010, 1019-20 (7th Cir. 1997) (internal marks omitted). It generally must come from controlling Supreme Court or Seventh Circuit precedent unless an examination of all relevant case law assures the Court that the recognition of the right by controlling precedent is merely a question of time. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). It is only in "rare cases where the constitutional violation is patently obvious, the plaintiff may not be required to present the court with any analogous cases, as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated." *Id.* at 951. When qualified immunity applies, a defendant is not merely entitled to a defense from liability; he is entitled not to stand trial." *Leaf v. Shelnutt*, 400 F.3d 1070, 1080 (7th Cir. 2005).

There are two prongs to the qualified immunity analysis: one, whether, when considering the facts in the light most favorable to the plaintiff, he suffered a violation of a constitutional right at all; and, two, whether that right was clearly established, as described above. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A Court may address either prong first, and need not reach the first if the answer to the second dictates that qualified immunity applies. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The plaintiff bears the burden of demonstrating that a right was clearly established at the time the alleged violation occurred. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 359 (7th Cir. 2005).

Finally, before proceeding to discuss the claims, the Court notes that the federal claims under § 1983 in this case implicate only the individual law enforcement officers in their individual capacities. This is because governmental entities may not be held liable under § 1983 under a theory of *respondeat superior*. *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 691 (1978). Governmental entities can thus be held liable only for injury caused by conduct that represents an official policy, whether it be an express policy, an unwritten practice or custom with the force of law, or the decision of an official with final policymaking authority. *See Bellings v. Madison Metro School Dist.*, 259 F.3d 807, 817 (7th Cir. 2001). In this case, the remaining claims involve the decisions and actions of individual law enforcement officers at Snider's property, and there is no evidence that an official policy by the Carroll County Sheriff's Department, the Carroll County Commissioners, or the Indiana Department of Natural Resources caused any of the alleged injuries. Moreover, the Department of Natural Resources is a state agency, and Congress has not abrogated the State's sovereign immunity with § 1983, so it may not be sued in federal court. *See Will v. Michigan Department of State Police*, 491 U.S. 58 (1989). For these reasons, the Court will grant the defendants' motions for summary judgment relative to the section 1983 claims against the entity defendants.

1.      *The Officers Were Lawfully on Snider's Property.*

Snider contends that the officers violated his Fourth Amendment rights the moment they entered onto his private property in the middle of the night. But law enforcement officers are generally allowed to approach a residence to contact its owner using the route that a normal visitor would take. *See United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002). Driveways, sidewalks, and walkways are generally not within the curtilage of the home, and thus not entitled to Fourth Amendment protection. *Id.* at 953. Even if the driveway in this case were the exception to that rule—and the Court sees no facts that would suggest that it is—Snider has pointed to no

11

precedent that demonstrates that it was clearly established that his driveway was curtilage, despite the general rule to the contrary.

Snider does point to *United States v. Jerez*, 108 F.3d 684 (7th Cir. 1997), to suggest that the officers' approach to his property (and subsequent investigation, as discussed below) "in the middle of the night are especially intrusive." *Id.* at 690. But in that case, officers awakened a suspect in the middle of the night by repeatedly banging on the door and window of his hotel room and then used the groggy suspect's purported consent to justify a search of the hotel room. *Id.* That reasoning—which evoked a strident dissent—is not closely analogous to this case, where the suspects were awake and engaged in various activities on the property.

      2.     *The Initial Encounter with Snider Was an Investigatory Detention Supported by Reasonable Suspicion*

This issue is the most difficult in the case. The Court has no doubt that Snider was seized when he was ordered, at gun point, to come out of his open garage, and then frisked for weapons. This was no longer, as Pekny and Dulin maintain, a "knock-and-talk" the moment that Snider submitted to their show of authority. The other defendants more reasonably suggest, and the Court agrees, that the initial seizure of Snider was an investigatory stop, and authorized under the parameters of *Terry v. Ohio*, 392 U.S. 1, (1968), and its progeny.

Officers may detain an individual whom they reasonably suspect of wrongdoing long enough to verify or dispel their suspicion. *Terry*, 392 U.S. at 21. The line between simple investigative questioning and an investigative detention is not always clear, but in a case like this where a suspect submits to an officer's show of authority, it is clearly established law that the officer has engaged in a *Terry* stop, subject to scrutiny under the Fourth Amendment. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991); *United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005) (holding that a seizure occurred when defendant complied with officer's

command, made at gunpoint, to stop backing away from the door). On the other hand, it is clear that "police officers do not convert a *Terry* stop into a full custodial arrest just by drawing their weapons or handcuffing the subject." *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007).

A *Terry* stop must be reasonable both at its inception and in its scope. *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). It does not require the same probable cause that would be necessary for a custodial arrest, but rather is permissible when the officers have "specific and articulable facts, which, taken together with the rational inferences drawn from them, reasonably warrant the intrusion." *United States v. Rivers*, 1212 F.3d 1043, 1045 (7th Cir. 1997) (quoting *Terry*, 392 U.S. at 21). This reasonable suspicion "requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *United States v. Bullock*, 632 F.3d 1004, 1012 (7th Cir. 2011). If officers have the requisite reasonable suspicion, the degree of the intrusion must be "reasonably related to the known facts." *United States v. Duguay*, 93 F.3d 346, 350 (7th Cir. 1996).

The first step in the qualified immunity analysis is to determine whether the officers violated Snider's Fourth Amendment rights in the first place. *Saucier*, 533 U.S. at 201. While it is no longer strictly necessary to apply the *Saucier* steps in order, in this case it makes sense: the second prong of the analysis applies only to the federal claims, and Snider's state law claim for false imprisonment and false arrest also turn on the lawfulness of the initial encounter.

Whether Pekny reasonably suspected that Snider and his guests were engaged in wrongdoing, or whether he was operating on nothing more than a hunch, is a critical question. One court has already found that the officers had no reason to suspect Snider. As Pekny admits in his deposition, there is nothing inherently illegal about discharging a firearm on ones own property, even at night, and Pekny neither saw Snider or any of the others unlawfully take wildlife nor discovered any deer carcasses.

The Court finds, however, that Pekny, and by extension Dunning and Bishop, had reasonable suspicion that Snider and his guests were engaged in criminal wrongdoing—specifically deer poaching, or perhaps some reckless behavior with firearms. It is true that for all Pekny knew Snider and his guests were merely engaged in target practice (though the late hour would make that unusual) or dealing with nuisance animals damaging Snider's property (unlikely, given the number of gunshots). But the fact that there are alternative, lawful, explanations for facts that raise an officer's suspicion does not make that suspicion unreasonable. In *Terry* itself, the suspects' activities—standing on a street corner and looking in shop windows— were not inherently criminal in and of themselves. *Terry* 392 U.S. at 22–23. Moreover, a *Terry* stop obviously does not require Pekny to have actually witnessed criminal wrongdoing—had he done so, he would have clearly had probable cause to arrest the suspect, not merely detain him for investigative purposes.

A lone gunshot in a rural area not known for poaching might fall short of the threshold of reasonable suspicion, but here there was considerably more. Pekny had more than just a hunch that deer poaching was afoot. He had himself heard multiple small-caliber rifle shots for a sustained period of time beginning around 10:30 at night. That alone is unusual and suspicious generally. It became significantly more particularized in light of the fact that the shots occurred just before firearm season in an area where there have been complaints of dear poaching in the past and in the immediate vicinity of a confirmed case just the previous deer season. And while there are plenty of innocuous explanations for a group of people standing around laughing in a private field late at night, the same behavior in a location where numerous gunshots had been heard over the course of an hour or more supports an inference that improper deer poaching *may* have been underway. And at that point, it may have reasonably raised Pekny's suspicion that the individuals were recklessly discharging firearms and putting themselves and potentially others at

14

risk. Under the totality of the circumstances, including Pekny's experience investigating deer poaching in the past, the Court concludes that Pekny had reasonable suspicion to warrant more intrusive investigation.

Alternatively, the Court would not conclude, at the second step of the *Saucier* analysis, that it would have been obvious to any reasonable officer that a brief seizure to allow investigation would violate Snider's rights under the Fourth Amendment. Snider's argument against qualified immunity is that his "Fourth Amendment right to be free from unreasonable searches, seizures, and arrest was clearly established at the time." DE 98 at 12. At first glance, it may seem odd to say that the officers could have acted "reasonably" if they did, in fact, lack a reasonable suspicion of wrongdoing—can one really reasonably act unreasonably? The short answer is that Courts have routinely applied qualified immunity to the *Terry* stop analysis. *E.g., Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008) (holding that qualified immunity protects those who make a reasonable error in determining whether there is a reasonable suspicion to conduct a *Terry* stop). Moreover, the same conundrum exists anytime the Fourth Amendment is implicated because the central inquiry (once the various interpretative doctrines are stripped away) is whether a particular search or seizure was reasonable. The Supreme Court has explained that this seeming contradiction is merely a consequence of the particular terminology used in Fourth Amendment jurisprudence and that "reasonable" does not mean the same thing in every context in which it is employed. *See Anderson v. Creighton*, 483 U.S. 635, 643–44 ("Had an equally serviceable term, such as 'undue' searches and seizures been employed, what might be termed the 'reasonably unreasonable' argument against application of *Harlow* to the Fourth Amendment would not be available . . . ."). The Court went on to note:

> We have frequently observed, and our many cases on the point amply demonstrate, the difficulty of determining whether particular searches or seizures comport with the Fourth Amendment. Law enforcement officers whose

judgments in making these difficult determinations are objectively legally reasonable should no more be held personally liable in damages than should officials making analogous determination in other areas of law.

*Id.* at 644 (internal citations omitted). The same reasoning applies to the *Terry* stop subset of Fourth Amendment searches and seizures.

Beyond a general invocation of the Fourth Amendment standard, Snider provides no closely analogous case law. He does cite *Payton v. New York*, 445 U.S. 573 (1980), for the proposition that warrantless seizures within the home are unreasonable, absent exigent circumstances. It is true that Snider was in his garage when the officers arrived. But the officers did not enter the garage or the residence and instead asked Snider to come out. This does not implicate *Payton*, which was concerned with protecting the threshold of the home against intrusion without a warrant. *See United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991) ("When the police assert from outside one's home their authority to arrest a person, they have not breached the person's privacy interest in the home."); *see also Johnson*, 427 F.3d at 1057 (finding a *Terry* stop when officers ordered an individual to stop backing away from an open door at gunpoint).

Although it is Snider's burden to come forward with closely analogous precedent, the Court notes that its own research has uncovered no precedent that would inform a reasonable officer that a *Terry* stop was unreasonable in this case. Most often cases involving gunshots heard *do* support reasonable suspicion of a crime, though admittedly most of those cases involve gun shots in significantly more densely populated areas, where discharge of a firearm would itself likely be a crime. See*, e.g.*, *Shoals*, 478 F.3d 850 (finding reasonable suspicion where police were responding to report of gunshots in Fort Wayne, Indiana); *United States v. Maher*, 145 F.3d 907 (7th Cir. 2009) (reasonable suspicion when investigating gunshots in South Bend, Indiana, where suspect holding his front pocket)*.* Moreover, the few cases involving stops of

illegal hunting activity have all upheld the stop, though in those cases there were more corroborating facts. *See, e.g.,* United States v. Weatherford, No. 2:11-CR-13, 2011 WL 5408441 (N.D. Ind., Nov. 8, 2011) (reasonable suspicion to suspect firearm hunting out of season based on previous findings of recently spent rifle casings and a suspicious playhouse that seemed too small for bow hunting); *Cornelius v. City of Andalusia*, 600 F. Supp. 2d 1209, 1224 (M.D. Ala. 2009) ("If an unfamiliar car enters and exits private hunting property in the evening hours, out of full hunting season, and there is a flashlight shining out of the car window, that justifies an objectively reasonable suspicion that someone is on that property to hunt deer at night, which is illegal regardless of whether the hunter has a right to be on the land."). But unlike the good faith exception in the context of a motion to suppress, the defendants need not identify cases that support their actions; it is enough that no precedent condemns it. The lack of any such precedent means that Snider has failed to meet his burden unless this is one of the rare cases in which the Fourth Amendment violation was obvious.

Having determined that the *Terry* stop was warranted at its inception, the Court must also consider whether the manner in which the search was conducted was reasonable under the circumstances. Again, Snider points the Court to no cases that would have clearly established that any element of the investigation violated his constitutional right. Given the fact that Pekny heard numerous gun shots coming from the property, it was not unreasonable to believe that Snider or Hokema had a weapon—the lack of a visible rifle does not rule out a concealed handgun—thus justifying a non-invasive pat-down search. *See Rivers*, 121 F.3d at 1045. Nor was it clearly established that the officers could not demand identification—quite the opposite. *See United States v. Jackson*, 377 F.3d 715, 717 (7th Cir. 2004) (holding that officers may insist that suspect provide identification during a *Terry* stop). Moreover, Snider's denial that anyone had fired a gun other than a flare gun or paintball guns contradicted what Pekny heard with his

own ears, and thus would have raised, rather than dispelled, a reasonable officer's suspicion that someone was poaching deer on the property.

Taking the facts in the light most favorable to Snider, the officers continued to detain him at gun point and prolonged the seizure while they sought the 10 other individuals that Snider stated were on the property. In light of Snider's unsatisfactory explanation for the gunshots, the officers' awareness (and Snider's admission) that there were many others on the property, and the fact that whatever gun or guns had been fired were unaccounted for, it was not unreasonable for the officers to secure their presence which was potentially in jeopardy until they had completed their investigation and identified the others present on the property, accounted for any firearms, and either dispelled or confirmed their suspicions of criminal wrongdoing. Courts have permitted far greater intrusions than a protective sweep of the open areas of a suspect's property. *See Leaf*, 400 F.3d at 1087 ("The underlying rationale for the protective sweep doctrine is the principle that police officers should be able to ensure their safety when they lawfully enter a private dwelling." (citing *United States v. Arch*, 7 F.3d 1300, 1303 (7th Cir. 1993)). It may not ultimately have been necessary for Officer Bishop to keep his gun pointed at Snider the entire time—hindsight is 20/20 and the risks associated with doing otherwise have proven fatal—but as the drawing of weapons is frequently approved during *Terry* stops, the Court cannot conclude that Bishops conduct was unreasonable, much less that there was a clearly established moment at which Bishop was required to holster his weapon.

Once the officers reached the pole barn and discovered six or seven other individuals, it was not clearly unreasonable to check them for weapons and insist that they remain seated with their hands in view while the search for Snider's other guests continued (even if Snider had clearly indicated there were 10 people, including himself and Hokema, there would still have been one or two unaccounted for). The officers were outnumbered—especially Bishop against

eight or nine, once the other officers moved off to secure the scene while they continued their search —and still did not know who had fired the guns and for what purpose. Finally, when Snider abruptly stood up, despite Bishop's previous order to the contrary, Bishop had some justification for placing him in handcuffs given the number of people he was attempting to control. His action was not unreasonable in this instance, and even if it were, it certainly would not have been obvious to any reasonable officer that using handcuffs in such a situation would transform a *Terry* stop into an unjustified custodial arrest, nor is there any closely analogous case law compelling the conclusion that handcuffs were unreasonable. *See United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005) ("For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.").

Thus, the Court concludes that the officers' conduct in this case comported with the requirements of the Fourth Amendment. And even if their conduct crossed the constitutional line, it was far from clearly established or obvious that they violated Snider's federal rights, at least up until the time when Officer Pekny believed that Snider was in possession of drug paraphernalia and released the other individuals.

> 3. *Officer Pekny and Deputy Dunning are not Entitled to Qualified Immunity on the Claim that They Unlawfully Searched the Pole Barn.*

Next, the Court considers whether the officers are entitled to qualified immunity for their search of the pole barn. Snider contends that Pekny and Dunning entered his pole barn twice: first, briefly to see if any of Snider's guests were in the barn and then again to conduct a more thorough search. The defendants claim that even under Snider's version of events, both entries into the barn were protective sweeps justified by the need to secure the area and locate anyone

who may have been hiding in the open barn, from where they could have launched an attack on the officers. Pekny also argues that the barn was not within the curtilage of Snider's home and therefore that the entry did not implicate the Fourth Amendment.

We may dispense with the second argument first: the barn was protected by the Fourth Amendment, and this is clearly established under Seventh Circuit precedent. In *Siebert v. Severino*, 256 F.3d 648 (7th Cir. 2001), the Seventh Circuit denied qualified immunity to an officer who entered and searched a suspect's barn, which was located about 60 feet from their home and outside the curtilage. *Id.* at 653. The officer argued that the suspect did not have a reasonable expectation of privacy in the barn and that even if he did, that expectation was not clearly established at the time of the search. *Id.* at 654. The court disagreed on both counts. An "enclosed structure is a typical location for a property owner to engage in private activities. Curious friends and neighbors, much less a government agent with a mission, would be expected to keep out." *Id.* The court recognized that the Supreme Court had approved "peering into the barn's open front," but refused to extend that permission to actual entry inside. *Id.* (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)). The court also found that the officer was not entitled to qualified immunity:

> This case seems to fit within the "obvious" scenario—a reasonable state actor would know that he cannot enter a fenced-in, closed structure located within 60 feet of a person's house without a warrant or some exception to the warrant requirement. But even if not reasonably obvious to Severino, a closely analogous case indicates that his conduct was unconstitutional: his search took place in 1996, and less than three years earlier the Fourth Circuit held that citizens enjoy an expectation of privacy in their barn. Therefore, Severino is not protected by qualified immunity.

*Id.* at 655 (citing *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 2001)). Based on controlling precedent, Snider had a reasonable expectation of privacy in his barn and a reasonable state actor should have known that.

The next question is whether the search of the barn was permitted by some exception to the warrant requirement. The defendants claim that this was a "protective sweep" necessary for the officers' protection. Whether such a protective sweep is permitted incident to a *Terry* stop is an interesting question, but ultimately one the Court need not resolve in this case.[4] Even assuming that the first sweep was legally authorized (or at least not clearly condemned), Pekny and Dunning did far more than sweep the barn the second time they went in: according to Snider, he saw them looking under his riding lawnmower and peering through boxes—obviously places that an individual with a gun could not hide. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990) (holding that a protective sweep is limited to "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched"). Therefore, based on the facts taken in the light most favorable to Snider, Pekny and Dunning violated a clearly established right when they searched Snider's barn without his consent, a warrant, or exigent circumstances. Therefore, the defendants' motions are denied with respect to the claim that Pekny and Dunning searched Snider's pole barn in violation of the Fourth Amendment.

As for Officer Bishop, however, he correctly points out that there is no evidence that he, unlike Pekny and Dunning, was personally involved in the search of the pole barn and did not enter the barn until after the first search warrant had been obtained. While his supervision of Snider and his guests may have enabled the other officers to search without interference, there is

---

[4] Protective sweeps of a residence incident to a custodial arrest are permitted by *Maryland v. Buie*, and the Seventh Circuit has extended the doctrine to cases in which officers are already lawfully in a residence based on exigent circumstances. *Leaf*, 400 F.3d at 1087. The Court is aware of no holdings regarding a protective sweep of a residence based solely on an investigative stop outside the residence, when officers had no other lawful reason to be in the residence. *But see Arch*, 7 F.3d at 1303 ("In our view, however, the fact that Arch was arrested in the motel lobby rather than his room counsels against a hasty resort to *Buie* to justify the search [of the room].").

no evidence that Bishop directed, countenanced, or even knew of the initial search of the pole barn. As such, he cannot be held liable under § 1983. *See Rascon v. Hardiman*, 803 F.2d 269, 273 (7th Cir. 1986) ("In short, '[i]ndividual liability for damages under section 1983 is predicated on personal responsibility.'" (quoting *Schultz v. Baumgart*, 738 F.2d 231, 238 (7th Cir. 1984)). Therefore, Bishop's motion for summary judgment will be granted relative to the illegal search claim, while Pekny and Dunning's motions will be denied.

4.      *The Officers Had Probable Cause to Arrest Snider After the Search of the Pole Barn.*

Having considered the initial seizure of Snider and the search of his property and barn, the Court turns to the claims dealing with the occurrences following from Officer Pekny's discovery of the wooden "dug out" box in Snider's pole barn. First, the Court considers whether the continued seizure of Snider amounted to a custodial arrest without probable cause in violation of the Fourth Amendment.

To begin, the Court notes that the fact Pekny and Dunning are not entitled to qualified immunity for the earlier warrantless search of the pole barn does not necessarily allow claims against them based on subsequent actions that rely on the dug out box recovered during that unlawful search.  This is in part because the "fruit of the poisonous tree" doctrine, which in criminal cases generally directs a court to exclude all evidence "tainted" by an illegal search or seizure, does not apply to civil claims made under § 1983.  While the Seventh Circuit has not specifically decided this issue, other circuits and district courts in this circuit have agreed that governmental officials are not liable for arrest or prosecution merely because it is premised on

evidence obtained in an unlawful search.[5] This rule makes sense for several reasons. First, "[t]he evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers a crime, which is no evil at all." *Townes v. City of New York*, 176 F.3d 138, 148 (2nd Cir. 1999). Second, "it would be odd if 'the law breaker whose Fourth Amendment rights are violated recovers more than an innocent victim of the same unlawful search an seizure.'" *Ferrell v. Bieker*, No. 1:03-CV-27-TS, 2006 WL 287173, at *7 (N.D. Ind. Feb. 3, 2006) (quoting *Padilla v. Miller*, 143 F. Supp. 2d 479, 492 (M.D. Pa. 2001)). Third, the exclusionary rule and civil liability for Fourth Amendment violations provide sufficient deterrence for police misconduct, and extending liability further to "tainted" actions, and any additional deterrence is unnecessary. *Id.* Moreover, the Court notes that in light of the lack of Seventh Circuit precedent and the persuasive precedent from other courts, the officers would be entitled to qualified immunity for "tainted" actions because it was not clearly established that officers could not decide to arrest Snider based on unlawfully obtained evidence.

Since they could rely on the item discovered in their search, the officers are entitled to qualified immunity for the continued detention of Snider. Even assuming the state court judge is correct and that Pekny was incorrect that the "dug out" box discovered in the barn was drug

---

[5]*See Townes v. City of New York*, 176 F.3d 138, 149 (2nd Cir. 1999) ("The lack of probable cause to stop and search does not vitiate the probable cause to arrest, because (among other reasons) the fruit of the poisonous tree doctrine is not available to assist a § 1983 claimant."); *Hector v. Watt*, 235 F.3d 154, 157 (3d Cir. 2000) ("We agree with *Townes*: 'Victims of unreasonable searches or seizures . . . cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution.'" (quoting *Townes*, 176 F.3d at 148.)); *Cannon v. Christopher*, No. 1:06-CV-267, 2007 WL 2609893, at *5 (N.D. Ind. Sept. 6, 2007) ("While it is true that the officers lacked reasonable suspicion or other cause to stop and detain Cannon's vehicle (at least that is what the state court held), once they did, they obtained sufficient evidence to properly arrest the plaintiffs with probable cause."); *Ferrell v. Bieker*, No. 1:03-CV-27-TS, 2006 WL 287173 (N.D. Ind. Feb. 3, 2006) ("[T]he weight of authority found by the Court holds that the "fruit of the poison tree" doctrine, which requires the exclusion of evidence found as a result of a violation of the Fourth Amendment in a criminal trial, does not apply in a § 1983 action.").

paraphernalia and provided probable cause for the arrest, Snider points to no precedent clearly

establishing at the time of the arrest that dug out boxes were not drug paraphernalia. Nor does

the Court find this result obvious from the face of the Indiana possession of paraphernalia

statute. While the statute does refer only to objects used primarily for introducing controlled

substances into the body, testing the strength, effectiveness, and purity of a controlled substance,

or enhancing the effect of a controlled substance, IC § 35-48-4-8.3(c), it is not beyond argument

that a box designed exclusively for the purpose of facilitating the use of marijuana does not fit

into any of those categories. Further, there is another, independent ground, that may sustain the

arrest: an objectively reasonable officer may have concluded that Snider committed the

additional crime of resisting a law enforcement officer under Indiana Code § 35-44-3-3(a)(3)

when he stood up despite the previous order to remain seated. *See Row v. Holt*, 864 N.E.2d 1011,

1017 (Ind. 2007); *see also United States v. Williams*, 495 F.3d 810, 818 (7th Cir. 2007) (holding

that an officer's "subjective reason for making the arrest need not be the criminal offense as to

which the known facts provide probable cause").

      *5.     No Evidence Supports Any Other Federal Claims*

      The defendants argue that they are entitled to summary judgment, for various reasons, on

any § 1983 claims arising from the execution of the two search warrants—the first for the pole

barn and Erdie's car and the second for the house and other vehicles— as well as the conspiracy

claims. The Court agrees. Snider does not respond to these arguments at all, so it is difficult to

tell what his position is regarding these claims, but the Court will address them briefly. As

discussed above, the fact that the initial search of the pole barn may have been unlawful does not

"taint" subsequent lawful actions by law enforcement agents.

      First, the officers did not violate any Fourth Amendment rights when they executed the

first search warrant on the pole barn. Officers are entitled to rely on a search warrant in good

faith unless they were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926 (1984); *see also Jones v. Wilhelm*, 425 F.3d 455, 465 (7th Cir. 2005) (citing *Leon* in the context of a § 1983 civil suit). The Seventh Circuit has explained that a belief is reasonable unless:

> (1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.

*United States v. Koerth*, 312 F.3d 862, 869 (7th Cir. 2002) (citations omitted). Here, Pekny was not dishonest in preparing the warrant affidavit. While he indicated (perhaps mistakenly) that he had found drug paraphernalia, he also described the precise item found, which permitted the magistrate to consider the actual evidence, including the dug out box, the marijuana pipe, and the money found on Erdie. Snider points to no cases invalidating a warrant based on a materially similar affidavit. Further, reliance on the warrant was not unreasonable: the Court has already noted that it was not clearly established law at the time that a dug out box was not itself criminal. Moreover, illegal or not, the dug out box reasonably could have provided probable cause to believe there might be marijuana inside or near it. It was not objectively unreasonable for the officers to rely on the warrant.

Second, the officers did not violate any of Snider's rights when he executed the second search warrant on his residence. The warrant was based on the observation of marijuana plants, explosives, and potentially illegal firearms. Even assuming, *arguendo*, that the "safety sweep" of the residence was unlawful, the violation would not have tainted the search warrant or the officers' good faith reliance on it.

Finally, there is no evidence to support Snider's claims that the defendants who remain in this case conspired with prosecutors or postal service employees to violate any of Snider's constitutional rights. In fact, it is not clear that Snider has sufficiently alleged a conspiracy, much less put forward enough evidence of one to survive summary judgment. To allege a conspiracy, a plaintiff must:

> (1) allege the existence of an agreement; (2) if the agreement is not overt, the alleged acts must be sufficient to raise the inference of mutual understanding (i.e., the acts performed by the members of a conspiracy are unlikely to have been undertaken without an agreement); and (3) a whiff of the alleged conspirators' assent ... must be apparent in the complaint. Indeed, a conspiracy claim cannot survive summary judgment if the allegations are vague, conclusionary and include no overt acts reasonably related to the promotion of the alleged conspiracy.

*Amudsen v. Chicago Park District*, 218 F.3d 712, 718 (7th Cir.2000) (internal citations and marks omitted). Here, the allegations are conclusionary and Snider has pointed to no evidence in the record that demonstrates an express or implied agreement between the defendants in this case and any other individuals.

**B.     State Law Claims**

The defendants also seek summary judgment on Snider's state law claims of trespass, false imprisonment, false arrest, and malicious prosecution.

*1.     Several of Snider's Claims Are Unavailable.*

Some of these claims may be addressed preliminarily based on the immunities and requirements imposed by the Indiana Tort Claims Act. First, summary judgment is appropriate in favor of all the individual officers because governmental employees are not individually liable for acts or omissions unless their actions are "(1) criminal; (2) clearly outside the scope of the employee's employment; (3) malicious; (4) willful and wanton; or (5) calculated to benefit the

employee personally." I.C. § 34-13-3-5(c). As there is no evidence that any of these exceptions apply, the individual officers may not be held liable.[6]

Second, the Act provides total immunity to employees or entities from liability for losses resulting from the "initiation of a judicial . . . proceeding," I.C. § 34-13-3-3(6), or "[t]he adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment,"*id.* § 34-13-3-3(8). This means that Snider cannot recover under Indiana law for his claims of malicious prosecution, *see Livingston v. Consolidated City of Indianapolis*, 398 N.E.2d 1302, 1305 (Ind. Ct. App. 1979), trespass and trespass to chattel, *see Herbert v. Reynolds*, No. 2:07-CV-91-PPS, 2009 WL 3010510, at *10 (N.D. Ind., Sept. 15, 2009), and intentional infliction of emotional distress, *see City of Anderson v. Weatherford*, 714 N.E.2d 181, 186 (Ind. Ct. App. 1999).

Third, Snider cannot recover against the Carroll County Board of Commissioners under a theory of *respondeat superior*. Indiana courts have held that counties do not have control over the acts of the sheriff, which is an office created by the Indiana Constitution with powers and duties established by the Indiana Legislature, and that a county Board of Commissioners lacks the necessary agency relationship to the sheriff or his deputies to give rise to *respondeat superior* liability. *See Delk v. Board of Commissioners of Delaware County*, 503 N.E.2d 436, 440 (Ind. Ct. App. 1987).

---

[6]The Court also notes that even if Officer Bishop were not immune from liability under I.C. § 34-13-3-6, the claims against him would fail because Snider did not serve him proper notice as required under Indiana Code § 34-14-3-8. *See Bienz v. Bloom*, 674 N.E.2d 998, 1004 (Ind. Ct. App. 1996) (When a governmental employee is sued personally the plaintiff is required to comply with the proper notice provisions of the Indiana Tort Claims Act).

2.      *False Imprisonment and Arrest*

This leaves only the claims for false imprisonment and false arrest against the Carroll County Sheriff's Department. "An arrest by a law enforcement officer without probable cause can give rise to civil liability for false arrest under Indiana common law."The defendants argue that they cannot be held liable for false arrest because there can be no *false* arrest where an arrest is supported by probable cause. *Row v. Holt*, 864 N.E.2d 1011, 1016 (Ind. 2007). Based on the discussion above, the Court agrees that the officers are entitled to summary judgment on the state law false arrest and false imprisonment claims.

It is unlikely that the officers had probable cause to arrest Snider when they first came on his property, and even if they did it would not have authorized an arrest because deer poaching is only a misdemeanor.  *See* I.C. § 14-22-38-3; *see also* I.C. § 35-33-1-1(a)(4); *Timmons v. State*, 734 N.E.2d 1084, 1087 (Ind. Ct. App. 2000) ("[A] warrantless arrest is permissible if a misdemeanor is committed in the officer's presence or, if, at the time of the arrest, the officer has probable cause to believe that the defendant has committed a felony." (quoting *Foster v. State*, 633 N.e.2d 337, 346 (Ind. Ct. App. 1994)). Nevertheless, as the Court concluded above, the officers did have reasonable suspicion sufficient to authorize a brief, minimally intrusive investigative detention, and their subsequent actions were reasonable in light of the developing circumstances. The initial detention was thus lawful and cannot support a claim for false imprisonment. *See Chestnet v. K-Mart Corp.*, 529 N.E.2d 131, 134 (Ind. Ct. App.1988) ("If a detention is lawful, by definition, it cannot constitute false imprisonment."); *Alexander v. Doe*, IP 01-1674-C-K/T, 2003 WL 22244782 (S.D. Ind. Aug. 20, 2003) ("If a defendant has probable cause to arrest the plaintiff or reasonable suspicion to make a Terry stop, or if the plaintiff cannot show an absence of probable cause or reasonable suspicion, then the plaintiff's false imprisonment claim fails.").

And although the reasonable suspicion that authorized the investigative detention did not authorize a formal, custodial arrest, the officers did at some point have probable cause to arrest Snider, whether for possession of drug paraphernalia, resisting a law enforcement officer, possession of a Chinese throwing star and an owl's foot, or, eventually, possession of marijuana, explosives, and illegal firearms. Snider's state law false arrest claim therefore also fails for the same reasons that his false arrest claim under § 1983 fails.

## CONCLUSION

Because the officers had a reasonable suspicion that Snider and his guests were engaged in unlawful deer hunting and perhaps other reckless and dangerous behavior potentially associated with repeated gun shots fired at night, summary judgment in the defendants' favor on all claims, except for Snider's federal claim that Officer Pekny and Deputy Dunning unlawfully searched his pole barn, is warranted. Moreover, the governmental entities are not responsible for any violations of their employees under a theory of *respondeat superior*. Accordingly, Defendant James Bishop's Motion for Summary Judgment [DE 85] is **GRANTED** in all respects. The State Defendants' Motion for Summary Judgment [DE 83] is **GRANTED in part** and **DENIED in part.** Likewise, the County Defendants' Motion for Summary Judgment [DE 89] is **GRANTED in part** and **DENIED in part.** Finally, Plaintiff Jesse Snider's Motion for Summary Judgment [DE 81] is **DENIED**.

SO ORDERED.

ENTERED:  September 27, 2012

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court